20576

L-J, INC. and Eastern Contractors Inc., Respondents, v. SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Appellant.

(242 S. E. (2d) 656)

414

*Daniel R. McLeod, Atty. Gen., C. Tolbert Goolsby, Jr., Dep. Atty. Gen., Marvin C. Jones* and *F. Kimball Joyner, Jr., Asst. Attys. Gen.,* and *Callison, Tighe, Nauful & Rush,* of Columbia, *for Appellant,*

*Greer & Milling,* of Darlington, and *Terrell L. Glenn* and *Charles Porter,* of Columbia, *for Respondent,*

January 10, 1978.

LITTLEJOHN, Justice:

The plaintiffs-respondents, L-J, Inc. and Eastern Contractors, Inc. (Contractors) are experienced road-building contractors. The two corporations undertook the project here involved as a joint venture; they are owned and/or controlled by Grady Jordan and Barney Jordan, who have built roads for the South Carolina Highway Department for more than 30 years. The defendant-appellant, South Carolina State Highway Department (Department) is a division of State Government charged with the duty of building and maintaining highways.

The contractors successfully bid, in the amount of $3,777,-000.00,[1] a job to relocate and construct approximately three and one-half miles of mountainous four-lane roadway on U. S. Highway 25 in Greenville County, ending at the North Carolina line. The road is described as being similar to an interstate highway. The project has been completed and the Contractors have been paid $3,922,000.00, which includes adjustments not in contest.

---

[1] Figures throughout this opinion are rounded off for brevity.

This action was brought by the Contractors to collect $3,106,000.00, plus interest, alleged to be due in addition to the amount already collected. The verdict prayed for includes expenses incurred over and above the bid price, plus $582,000.00 profit and $262,000.00 financing charges incurred. The complaint contains five causes of action based on alleged (1) mutual mistake, (2) false representations, (3) breach of implied warranty, (4) unjust enrichment, and (5) denial of due process of law and equal protection of the law as provided in the Constitutions.

The answer amounts to a general denial, setting forth that the Contractors have been fully paid, and includes a counterclaim for rock taken from the project by the Contractors and sold to third parties.

The case was tried before the judge without a jury. He entered a judgment in favor of the Contractors in the amount of $409,000.00, plus simple interest at the rate of 6% from March 1, 1973. This amount represented compensation for the excavation and removal of 524,000 cubic yards of solid rock, at the rate of 78¢ per cubic yard. The Department has appealed.

On August 26, 1968, the Department advertised the project for bids to be opened on September 17, 1968. The Contractors requested and received bid material, which included detailed cross-sections, boring scroll, and standard specifications of the Department. When the bids were opened on September 17, 1968, the Contractors, were discovered to be the low bidder by approximately $800,000.00. They were disturbed by the fact that their bid was so much lower than the next lowest bid, and proceeded to discuss the matter with S. N. Pearman, the Chief Highway Commissioner, with it in view to forfeit their bidder's bond in the amount of approximately $180,000.00. They decided against this procedure because of the strained relationship it might create with the Department, with which these contractors did considerable business.

Being still reluctant to sign the contract, the Contractors, on September 18, 1968, employed Wilbur Smith and Associates, a consulting engineering firm, and requested that an estimate be made of the quantity of rock required to be removed in the construction of the project.

The contract called for the removal of some 8 million cubic yards of unclassified material. Unclassified material or excavation is adequately defined as anything that lies on or under the ground within the geographical limits defined by the contract, whether it is sand, dirt, earth, rock, boulders, or layers of granite gneiss. The removal of rock is far more expensive than removal of dirt, clay, sand, etc., which is usually referred to as common excavation. The Contractors had bid on the basis of their own estimation that 547,000 cubic yards of the unclassified material was rock and that the remainder was common excavation. The Contractors had figured their bid on the basis of $1.12 per cubic yard for the removal of rock, and 26¢ per cubic yard for the removal of common excavation. Fear that there might be more rock than estimated brought about the Contractors' dilemma. On September 30, 1968, Wilbur Smith and Associates, by letter addressed to the Contractors, estimated that 682,000 cubic yards of rock would have to be removed. On October 10, 1968, the parties formally executed the contract and thereafter the Contractors entered upon the job and completed the project.

It developed that there was considerably more rock than had been estimated by the Contractors or Wilbur Smith and Associates. The Contractors contend that there were approximately 2,800,000 cubic yards of solid rock, but the judge rejected this figure, holding that it was . . . "based purely on an estimate and is entirely too conjectural and speculative on which to base an award of damages for the [Contractors]."

The gist of the lower court ruling is that the Department should pay for the removal of 524,000 cubic yards of solid rock not anticipated by the Contractors.

An understanding of the contract, out of which the controversy arises, is necessary to a discussion of the issue.

The proposal inviting bids stipulates that the Contractors have made an examination . . . "of the Specifications and Contract Form, including the Special Provisions contained herein, also of the Plans, and of the site of the work, and propose to furnish all necessary machinery, equipment, tools, labor and other means of construction, and to furnish all materials specified, in the manner and at the time prescribed, and understand that the quantities of work shown herein are approximately only and are subject to increase or decrease, and further understand that all quantities of work, whether increased or decreased, *are to be performed at the following unit prices,* except in cases where these Specifications provide for payment under a Supplemental Agreement or on a Force Account basis : . . . ." (Emphasis added.)

The proposal form then proceeds to set forth a "Schedule of Prices" indicating (1) the approximate quantities or work and/or services required by the Department, (2) item with unit price, (3) unit price paid in dollars and cents, and (4) amount bid in dollars and cents; (2), (3) and (4) are filled in by the bidder. There are 61 Schedules of Prices. The largest Schedule of Prices and the one which brings about the controversy for the court, is one which calls for the removal of approximately 8,067,924 "cubic yards of unclassified excavation." The unit price bid was 34¢ per cubic yard, for a total of $1,743,094.16.

The proposal further stipulates that the successful bidder shall . . . "do all Extra Work which may be required to complete the work contemplated, at unit prices or lump sums, to be agreed upon in writing prior to starting such extra work, or if such prices or sums cannot be agreed upon, to perform such work on a Force Account basis, as provided for in the Specifications."

The Department's Standard Specifications, which are a part of the contract, read in relevant parts as follows:

"1.13 Contract. . . . The contract shall include the proposal, contract form and contract bond, these specifications, supplemental specifications, special provisions, general and detailed plans, also any written change orders, supplemental agreements and force account work orders that are required to complete the construction of the work in an acceptable manner, including authorized extensions thereof, all of which constitutes one instrument.

. . . . .

2.04 Interpretation of Quantities. The quantities listed in the proposal form are approximate only and are prepared for the comparison of bids. Payment to the Contractor will be made only for the actual quantities or work performed or materials furnished in accordance with the contract, and it is understood that the quantities listed in the proposal form of work to be done and materials to be furnished may each be increased, diminished or omitted, as hereinafter provided, without in any way invalidating the prices bid.

2.05 Examination of Plans, Specifications, Special Provisions and Site of Work. The bidder is required to examine carefully the site of the proposed work, the proposal, plans, specifications, special provisions and contract forms before submitting a proposal. It is mutually agreed that submission of a bid shall be considered *prima facie* evidence that the bidder has made such examination and satisfied himself as to the conditions to be encountered, as to the character, quality and quantities of work to be performed and materials to be furnished and as to the requirements of the contract.

. . . . .

4.03 Alterations of Plans or Character of Work. The Engineer shall have the right to make such alterations in the plans or character of the work as may be necessary or desirable during the progress of the work to complete satisfac-

torily the intended construction. Such alterations shall not be considered as a waiver of any conditions of the contract nor invalidate any of the provisions thereof.

The right is reserved to increase or decrease any or all of the items in the list of approximate quantities shown in the proposal form. The total amount of such increase or decrease, whether it applies to one or several items, shall not exceed in value twenty (20%) percent of the total contract amount, except that variations in the items of solid rock excavation or bridge foundation work shall not be considered in determining increases or decreases under this provision, it being understood that quantities of these items cannot be determined accurately before the work is done. . . . [The contract did not include an 'Item of Solid Rock Excavation.']

. . . . .

5.02 Plans and Working Drawings. Plans, consisting of general drawings and showing such details as are necessary to give a comprehensive idea of the construction contemplated, will be furnished by the Department. Road plans will show the alignment, profile, grades, and typical cross-sections. . . .

. . . . .

The information contained upon the plans regarding the results obtained from test piles and borings is a record of the conditions revealed by field work and shows conditions that were encountered at the place where the test piles were driven or the borings made, as nearly as those conditions could be interpreted by the Engineer observing the operations. The Contractor is not bound to accept or rely on these data but shall interpret them in the light of his own experience, and he should make such additional borings and investigations, including test piles, as he may desire in order to determine or satisfy himself concerning the conditions affecting lengths of piles or governing or entering into the construction of the foundations.

. . . . .

9.03 Payment and Compensation for Altered Quantities. When alterations in plans or quantities of work as herein provided for are ordered and performed, and when such alterations result in increase or decrease of the quantities of work, *the Contractor shall accept payment in full at the contract unit prices for the actual quantities of work done* (except in cases where a supplemental agreement is executed in accordance with the provisions of Section 4.03); and allowance will not be made for anticipated profits. [Emphasis added]

. . . . .

13A2 Classification . . . .

(b) *Unclassified Excavation.* This classification shall consist of roadway and drainage excavation performed under this section regardless of the materials encountered or the manner in which they may be removed, and shall include:

1. Stripping. This work shall consist of excavating, removing and disposing of all unsuitable material from the ground surface of borrow and material pits, or soft, spongy, unstable, and other unsuitable material from the ground surface within the roadway.

2. Borrow. This work shall consist of removing and placing of material obtained from borrow pits. Borrow shall be used when sufficient quantities of suitable ematerials are not available from the roadway, ditches, or channels to complete the work.

. . . . .

## 13F METHOD OF MEASUREMENT

13F1 *The quantity of work done under this item shall be measured in cubic yards of Unclassified Excavation,* which shall be the material acceptably excavated as herein prescribed, measured in its original position, and determined from cross sections by the method of average end areas. . . . [Emphasis added.]

. . . . .

### 13G BASIS OF PAYMENT

The yardage measured as provided in Sections 13F1 . . . above shall be paid for at the contract unit price per cubic yard for Unclassified Excavation, . . . which price and payment shall constitute full compensation for excavating the material, hauling not over 3,000 feet of materials, the formation and compaction of embankments, disposal of surplus or unsuitable materials, stripping, preparation and compaction of subgrade and shoulders, terracing of borrow pits, removal and resetting of mail boxes, and the furnishing of all equipment, tools, labor and incidentals necessary to complete the work in an acceptable manner, except overhaul as defined in Section 19."

Special Provisions of the Contract, upon which the Department relies heavily to sustain its position, are as follows:

"This project is to be constructed under the South Carolina State Highway Department's Standard Specifications for Highway Construction Edition of 1964 and the following Special Provisions:

.   .   .   .   .

12. PRE-SPLITTING (CONTROLLED BLASTING FOR FORMING FACES OF SLOPES IN ROCK CUTS) : Pre-splitting technique is defined as the establishment of a free surface or shear plane in rock by the controlled usage of explosives and blasting accessories in appropriately aligned and spaced drill holes.

Investigations on this project indicate that rock is prevalent in some cut sections. Faces of cut slopes shall be formed by pre-splitting where, in the opinion of the Engineer, the characteristics of the rock is such that pre-splitting is feasible and where so directed by the Engineer.

.   .   .   .   .

Pre-splitting will not be paid for as a separate item. Drilling, explosives, loading of drill holes, blasting and all labor, materials, tools, equipment and incidentals necessary to accomplish the pre-splitting required by the Engineer

shall be included in the contract unit bid price for Unclassified Excavation. Measurement and payment of unavoidable over-breakage shall be in accordance with Sections 13F1 and 13G of the Standard Specifications. Overbreakage which, in the opinion of the Engineer is avoidable shall not be included in the final measured quantity of Unclassified Excavation.

14. ROCK EXCAVATION: Borings and investigations on this project indicate that rock may be encountered at certain locations and elevations. The data assembled from these investigations and borings are on file in the Central Office and the contractor may review such data for information purposes only. Rock found or encountered at any location or elevation on this project shall not be considered as a waiver of any conditions of the contract nor shall it be a basis for any claims for excavating rock. *Payment for all excavation shall be made at the contract unit bid price for Unclassified Excavation except as otherwise stipulated in these Special Provisions."* (Emphasis added.)

The agreement is of a type generally known as a "Unit Price" contract. It is one in which payment of compensation is made at specified unit rates for each of the different kinds of work performed or materials furnished. The bidder submits unit prices for each classification of work and submits a total bid price based on the aggregate of the units of each kind of work in the proposal at the bidder's unit price for the number of units appearing in the proposal. All compensation due the contractor is determined by the actual units of each type of service rendered or material supplied. The competitive bidding process requires that all bidders have an opportunity to compete for the same project in order that the proposals may be intelligently compared. Frequently in unit price contracts, there are items of work which will be required to be performed but the precise dimensions of the work cannot be determined in advance of the performance. The contracting authority makes an estimate of the

units of work or material of each type anticipated to be required for completion of the project. Here the contract permits a renegotiation if there is an underage or overage of 20%. The Department estimated 8,067,924 cubic yards of unclassified excavation; there was actually removed 8,592,-856 cubic yards, which is well within the 20% tolerance permitted.

Prior to advertising for bids, representatives of the Department had gone upon the premises and made 33 borings along the center line, which were plotted onto a boring scroll. These borings were made because of the decision of the Department to use a rock excavation technique referred to as "pre-splitting" whenever it was feasible; these were made available to prospective bidders. The boring scroll specifically noted, "These borings are for informational purposes only. See Paragraph No. 14 in Special Provisions." This paragraph 14 is quoted above.

Upon receiving the proposal and prior to submitting a bid, Mr. Grady Jordan and other representatives of the Contractors went upon the premises and observed three other prospective bidders making subsurface tests for the purpose of determining how much of the unclassified excavation was rock and how much was common excavation. The normal charge for removing rock would appear to be approximately $1.12 per cubic yard. The cost of removing common excavation would normally be approximately 26¢ per cubic yard, and so it was important to determine, as best a bidder could, the amount of rock as compared with the amount of common excavation to be removed. Even though Mr. Jordan observed other contractors, in preparation to bid, making test borings of their own to get as much information as they could concerning the subsoil and quantity of rock to be encountered, and even though he had with him a drill rig, he made no borings or tests. The Contractors used the 33 borings made by the Department and assumed that rock lay on a level plane. The assumption was entirely erroneous.

The Jordan party remained on the premises some six or seven days. Three of the Contractors' employees estimated the amount of rock involved, as follows: Mr. Pollard, 527,000 cubic yards; Mr. Page, 862,000 cubic yards; Mr. Hazel, 515.000 cubic yards. The Contractors' composite bid was based on an estimation that there would be 547,000 cubic yards of rock for removal.

The order of the lower court recites that:

". . . [W]itnesses for the plaintiffs [Contractors] stated that in their opinion, the plaintiffs blasted and removed between 2,800,000 and 2,900,000 cubic yards of solid rock. This testimony is based purely on an estimate and is entirely too conjectural and speculative on which to base an award of damages for the plaintiffs.

". . . [T]he contract . . . provided for . . . 8,067,924 cubic yards of unclassified excavation. It is . . . uncontradicted . . . that the plaintiffs removed 8,592,856 cubic yards of [unclassified] material. This is an overrun of 524,932 cubic yards."

The overage is less than the 20% contemplated by the contract necessary for an adjustment of the unit price. The lower court concluded and found as a fact that all of the overrun of 524,932 cubic yards of material was solid rock; for this the Contractors have been paid at the rate of 34¢ per cubic yard for unclassified excavation as specified in the contract. The lower court held that the Contractors were entitled to an additional 78¢ per cubic yard, this being the difference between 34¢ and $1.12. Judgment was ordered for $409,000.00, which was arrived at by multiplying 78¢ by 524,932.

This was the extent of the award. It was made on the first and third causes of action, which alleged (1) mutual mistake and (3) breach of implied warranty. The other three causes of action were rejected by the lower court. The

judge held that the Contractors had failed to establish damages by the required degree of proof. He said:

"I find as a fact from this testimony that the plaintiffs' internal financial records are not reliable. These records are not trustworthy and are totally lacking in credibility. Therefore, the plaintiffs' financial records as prepared and kept at the plaintiffs' Central Office would not be a proper basis on which to measure the plaintiffs' losses from the construction of this highway in Greenville County under the plaintiffs' contract with the defendant. The plaintiffs bear the burden of proof on the question of their damages. The plaintiffs do not have to prove their damages to a mathematical certainty, but the plaintiffs do have to prove their damages to a sufficiently reasonable certainty so that the fact finder can determine what amount is fair, just and equitable."

The lower court held that the Contractors had failed to prove their second cause of action based on false representations, their fourth cause of action based on unjust enrichment, and their fifth cause of action based on denial of due process of law and equal protection of the law as provided in the Constitutions. It also held that the Department had failed to prove its counterclaim. There is no appeal from any of these rulings.

The appeal contests the correctness of the lower court in finding that the Contractors are entitled to judgment based on their first cause of action, alleging mutual mistake, and their third cause of action, alleging breach of implied warranty. The issues for determination on this appeal are accordingly narrowed.

We think that the disposition of the case hinges upon the first three questions, all of which are related, as set forth in the Department's brief. These involve several exceptions, but the questions are appropriately phrased as follows:

"1. Did the lower court err in holding that, under the terms of the contract, the Department is obligated to pay

the contractor for overruns in solid rock excavation at One and 12/100 ($1.12) dollars per cubic yard?

2. Did the lower court err in finding as a fact that the contractor and the Department were mutually mistaken as to the amount of solid rock that had to be excavated and removed from the project limits by the terms of the contract?

3. Did the lower court err in holding that the Department breached an implied warranty of subsurface conditions by furnishing to the contractor certain boring data upon which the contractor had a right to rely in making its bid on the project?

We first answer the question, "Does the evidence support a finding of mutual mistake so as to entitle the parties to rescind the contract?"

"The formation of a binding contract may be affected by a mistake. Thus, a contract may be avoided on the ground of mutual mistake of fact where the mistake is common to both parties and by reason of it each has done what neither intended." 17 Am. Jur. 2d *Contracts* § 143 (1964).

"The rule supported by the authorities is that if, in the expression of the intention of one of the parties to an alleged contract, there is error, and that error is unknown to, and unsuspected by, the other party, that which was so expressed by the one party and agreed to by the other is a valid and binding contract, which the party not in error may enforce. In other words, a party to a contract cannot avoid it on the ground that he made a mistake where there has been no misrepresentation, there is no ambiguity in the terms of the contract, and the other contractor has no notice of such mistake and acts in perfect good faith. A unilateral error, it has been said, does not avoid a contract. . . ." 17 Am. Jur. 2d *Contracts* § 146 (1964).

The lower court has correctly found that the Department made no false representations. The gist of the court's holding is that the Contractors and the De-

partment made a mutual mistake as to the amount of solid rock which would have to be removed, and that the 33 borings amounted to warranties. Some contracts provide for the removal of classified excavation. In such a case a separate unit price would be bid as to common excavation on the one hand, and rock on the other. As indicated hereinabove, apparently the cost of removing rock is approximately $1.12 per cubic yard, while the cost of removing dirt, etc., is approximately 26¢ per cubic yard. The bid of 34¢ per cubic yard was a balance bid based on the judgment of the Contractors. The Department made no estimate of the amount of rock to be excavated; it did make an estimate as to the amount of unclassified excavation which would have to be removed. The estimate was rather accurate because the amount of unclassified excavation was well within the 20% tolerance referred to in the contract. The Contractors have been paid for the overage of unclassified excavation—the same being 524,932 cubic yards.

The Contractors attempt to sustain the order of the ■ lower court by asserting that the judge rescinded the contract. The Department argues that the contract was not rescinded because the judge concluded that the Department should be "liable to the plaintiffs [Contractors], *under the terms of the agreement between the parties,* for excavation of 524,932 cubic yards of solid rock . . . ." (Emphasis added.) Normally, the rescission of a contract must be accompanied by an offer to return the consideration paid, and normally the damages are awarded on a *quantum meruit basis.* Under the ruling, as quoted above, that the measure of damages had not been sufficiently proved, an award on the basis of *quantum meruit* would, of course, be an impossibility. A rescission of the contract was not specifically prayed for in the complaint, and the judge has not specifically set it aside. At the same time, the court has held that the cause of action for "mutual mistake" had been proved. Inasmuch as we hold that there was no mutual

mistake and the contract should not be rescinded, we need not technically interpret the lower court order.

The contract did not speak in terms of "rock excavation" and in terms of "common excavation." It did speak in terms of "unclassified excavation," which included both. The Department and the Contractors appreciated the fact that an estimate of the amount of rock excavation and the amount of common excavation was necessary prior to bidding. It was the responsibility of all bidders to make these estimates. The Department never knew, and never pretended to know, the amount of rock which had to be removed. The Contractors never knew and failed to make tests in an effort to find out. It is apparent that other bidders made their own subsoil tests and, even though they used the 33 borings which were given them for informational purposes only, they did not rely solely upon them. It cannot be seriously argued that these borings alone are a sufficient basis for estimating the amount of rock beneath the surface.

The mistake was not mutual. It was made, not by the Department, but by three of the Contractors' employees and Wilbur Smith and Associates, all of whom underestimated the amount of rock. The Department had no reason to estimate the amount of rock because it was an "unclassified excavation" contract. It did have reason to estimate the amount of unclassified excavation, which it did with reasonable accuracy. On the other hand, it was imperative that the Contractors estimate the amount of rock and estimate the amount of common excavation in order to arrive at an intelligent, balanced bid. The Contractors simply failed to make sufficient tests and investigations. Those who did make their own tests bid at least $800,000.00 more than the Contractors.

Grady Jordan, general manager of the joint venture, testified as follows:

"Q. . . . Well, is there any place that says in words on these bid documents, how much rock the Highway Department estimates is in this project?

"A. No."

Barney Jordan, President of L-J, Inc., testified:

"Q. Mr. Jordan, how much did the Department represent to contractors was the amount of total unclassified excavation?

A. How much did the Highway Department represent to the contractors?

Q. Yes, sir.

A. They represented 8 million 26 or whatever you just read.

Q. All right, the figure we just talked about a moment ago?

A. That's right.

Q. How many cubic yards of the unclassified excavation did the Department represent to contractors was soil on earth type material?

A. I don't think the Highway Department represented any amount to be soil.

Q. All right, sir.

A. Because it was unclassified.

Q. All right, and they didn't represent any amount of cubic yardage as being rock?

A. Not to me they didn't.

Q. All right, sir. They made no such representations?

A. Not to me.

Q. And you know for a fact that different contractors that bid on this job estimated different quantities of rock excavation, using their own methods?

A. You are more than likely correct, yes, sir.

Q. Your own people made different estimates?

A. That is correct.

Q. And the Department only represented the total amount of unclassified excavation?

A. Correct.

Q. The composition of the unclassified excavation was an unknown factor, wasn't it?

A. Yes, sir.

Q. That is the extent of the rock was unknown and the extent of the soil was unknown?

A. Yes, sir.

Q. And because of the unknown extent of the quantities of rock and the unknown extent of the quantities of soil, that created a risk element, didn't it, Mr. Jordan?

A. Correct.

Q. So a risk element was involved as to the quantity of rock and the quantity of soil?

A. Yes."

We now answer the question, "Does the evidence warrant a finding of a breach of implied warranty?" The 33 borings involved no false representations. Each was a true revelation of the content of the earth at the 33 sites. The Contractors' problem arises because the borings were misinterpreted. It was assumed that rock lay on a level plane and this assumption was simply erroneous.

The Department specifically stated that "These borings are for informational purposes only. See Paragraph No. 14 in Special Provisions." Paragraph 14 alerted the bidders to the fact that ". . . all excavation shall be made at the contract unit bid price for unclassified excavation except as otherwise stipulated in these special provisions." The boring scroll and the 33 borings were for informational purposes only, and although the bidders were permitted to use them, there was certainly no express or implied warranty or representation of any material fact upon which the Contractors were entitled to rely.

In contracts such as this, there is always an element of chance, an awareness of uncertainty and a conscious ignorance of the future. A bidder estimates its chances and fixes the compensation accordingly. It assumes a risk. It would hardly be argued that the Department would be entitled to rescind the contract and pay less than 34¢ per cubic yard if it had developed that there was less rock than was estimated by the contractors. George Tillman Williams, project manager for the Contractors, emphasized this in his testimony:

Q. When you bid on these projects, you take a certain gamble as to the amount of rock that might be there? Is that correct?

A. Yes, sir.

Q. And if you win, you win? Is that right? Suppose you had taken this job and you had found zero yards of hard rock? How much would you owe the Highway Department?

A. We would not owe them anything.

Q. You wouldn't owe them a penny? You would go away smiling, wouldn't you?

A. Yes, sir. I sure would."

Counsel for the Contractors review a multitude of related cases which have some appeal. The Department relies largely on our own case of *Blassingame v. Greenville County,* 150 S. C. 167, 147 S. E. 848 (1929). The Contractors attempt, but without success, to differentiate that case from the one now before us. In *Blassingame,* as here, the contract was made in contemplation of uncertainty as to the location and quantity of rock. In *Blassingame,* the rock quantity was initially estimated, but not properly envisioned or predicted by either party, but the court held that the contractor assumed whatever risk was involved.

The Contractors, having entered into a solemn agreement, must abide by the terms thereof. They took a risk for a consideration, and have no right to call upon the courts to

protect them against the consequences of erroneous judgment formulated by their own carelessness and failure to make adequate tests and investigation prior to bidding.

Several other questions have been submitted to the court, but our disposition of the first three questions, as indicated hereinabove, makes it unnecessary to treat each separately.

Having concluded that the lower court erred in granting judgment in favor of the Contractors, the order appealed from is

Reversed.

NESS, RHODES and GREGORY, JJ., concur.

LEWIS, C. J., dissents.

LEWIS, Chief Justice (dissenting):

I respectfully dissent. The conclusions of the trial judge that the respondents (contractors) had established their right to recover is supported by the record and the judgment should be affirmed.

The contractors, acting in a joint venture, successfully bid, in the amount of $3,777,470.48, a contract consisting primarily of excavation and fill work required for the construction of the last 3.515 miles of U. S. Highway 25 in Greenville County, ending at the North Carolina line. The road was to be built through a mountainous area and involved the excavation of a large amount of solid rock. This action resulted from disagreement between the parties over responsibility for the losses sustained by the contractors from the necessity to excavate a large amount of rock not anticipated by any of the parties.

The project has been satisfactorily completed and the appellant (Department) has paid the contractors $3,922,433-.20, which includes payments for additional work done. The contractors brought this action to collect over $3,000,000, plus interest, which was alleged to be due in addition to the

amount already collected. The complaint alleged several causes of action, among them: (1) mutual mistake as to the amount of solid rock that had to be excavated and removed in order to construct the highway; and (2) a breach of an implied warranty by setting forth inaccurate information in the specifications, borings and data supplied to the contractors by the Department, upon which the contractors relied in making their bid on the project.

This is an action at law but, by agreement, was tried before the trial judge without a jury. After hearing voluminous testimony, the trial judge granted judgmeent to the contractors on their causes of action for mutual mistake and breach of implied warranty in the amount of $409,446.96, plus interest. This amount represented additional compensation for the excavation of 524,932 cubic yards of solid rock at the rate of $0.78 per cubic yard.

While the appeal presents several issues, the determinative one, in my opinion, is whether the lower court erred in granting judgment to the contractors on the cause of action for breach of implied warranty, i. e., was there any competent evidence to sustain the judgment. For, if there was any evidence to sustain the factual findings of the lower court, such findings are binding on appeal and judgment must be affirmed.

On August 26, 1968, the Department advertised for bids to be opened September 17, 1968. In response to this advertisement, the contractors requested and received the bid materials furnished by the Department, consisting of a bid proposal, detailed cross sections, and the boring roll. In addition, the contractors already had in their possession the Standard Specifications for Highway Construction, which are a part of any highway construction contract awarded by the Department. Most of the pertinent portions are set forth in the opinion of Justice Littlejohn and will not be reproduced here. All of the foregoing bid materials were prepared by the Department.

Included in the bid proposal was an estimate of quantities of various items of work under the contract. Importantly, bidders were informed that the Department anticipated removal of approximately 8,067,000 cubic yards of "unclassified excavation". In the contract in issue, unclassified excavation constituted the largest single bid item. The contractors developed a composite bid price for that item, based upon an estimate that 547,000 cubic yards of the unclassified material was blasting or shooting rock and the remainder was common excavation, which could be removed with heavy equipment. Rock excavation was far more expensive than common excavation. Therefore, any alteration or change which materially increased the amount of the expensive rock excavation would change the character of the contract and would not be within the intent of the parties.

The trial judge found that the Department was liable to the contractors for "a breach of an implied warranty by setting forth inaccurate information in the specifications, borings and data supplied by the defendant (Department) upon which the plaintiffs (contractors) relied in making their bids on the project."

The record supports the conclusion that the Department, in the bid materials furnished, made representations concerning rock quantities upon which the contractors were entitled to rely in computing their bids. Properly considered in determining this issue are design changes made by the Department, cross sections furnished of the proposed highway, and the boring roll which represented the Department's investigation as to subsurface conditions on the project.

The boring log or roll furnished was prepared by the Department and reflected the work of its employees. A Department employee was sent to the project site prior to advertisement for bids to make borings because of the decision to use a rock excavation technique known as "presplitting" whenever feasible. He was required to locate the

top of hard rock along the centerline in order that a preliminary decision could be made on the condition of the rock as it related to pre-splitting. In all, this employee made thirty-three (33) borings and removed three core samples; no boring was more than forty-five (45) feet from the centerline. The results of these borings were plotted on a centerline profile sheet and contained the notation that the borings were "for informational purposes only."

The detailed cross sections furnished to the contractors showed the slope of the highway embankments at various intervals along the project. Special provision 17 (not included in the opinion of Justice Littlejohn) provided that: "The slope in earth cuts shall be 2:1 and the slope in rock cuts shall be 1/4:1." The testimony for the contractors showed that they interpreted the grade of the slope, as shown on the cross sections, to indicate where rock would be encountered and that it lay on a level plane, a conclusion consistent with the documents. In other words, where the cross sections showed a 1/4:1 slope, the contractors concluded that the Department represented that rock would be encountered at that point and earth where a 2:1 slope was designated. This was in accordance with Special Provision 17.

The record clearly shows inaccuracies in the boring data and cross sections furnished by the Department. There was testimony that in one area the contractors hit rock at a depth of 38 feet where the boring of the Department showed rock at 74 feet. The contractors' witnesses testified that 53,803 cubic yards of rock were excavated in this area where calculations using the Department's documents revealed that only an estimated 8,666 cubic yards were involved. In another area, it was testified that rock was encountered at least 30 feet above where it was shown on the Department's boring data, and that hard granite was found where the Department's boring data referred to silty sand with clay, mica, and disintegrated rock. In this latter area, a witness testified

that approximately 36,759 cubic yards of rock were excavated while the Department's boring data showed that rock was below grade level.

A major portion of the contractors' case was devoted to unexpected rock quantities in the project area referred to as "big cut". The project manager for the contractors testified that computations based on the bid cross section revealed an estimated 360,000 cubic yards "shooting rock" in the area. He and other witnesses for the contractors calculated these unexpected quantities of rock in the "big cut" in excess of one million cubic yards.

There were also instances where the conditions encountered in the performance of this project were different from the plans and specifications of the Department. In one area the plan showed a fill to be constructed. There was testimony that the plans called for a pipe or "drainage structure" under the road at the fill so that water wouldn't "pond", but the pipe was eliminated and the contractors had to "drill and shoot" a 200 foot cut in order to drain "the area all the way down the left hand side of the road" and turn the water out "through a channel change in the gulley." The Department's construction engineer stated that the foregoing cut was not shown on the bid plans and was a change ordered by him.

A problem similar to the foregoing occurred in another area. There was testimony that the cross section sheets showed a fill on the "left and right but it turned out to be a cut on the right." Instead of hauling in dirt to make the fill, "a 190 foot cut" had to be "drilled and shot." The excavation for the cut involved both dirt and rock. The Department's construction engineer testified that the cross sections did not show the cut and that this change was ordered by him which increased the quantities of excavation, for which the contractors were paid $.34 per cubic yard.

The record supports the conclusion that the Department's plans misrepresented the design of the project or the subsurface conditions in, at least, the foregoing areas; that the

contractors were entitled to rely on these representations; and that they were thereby misled in their calculations of rock quantities.

Testimony of the contractors was to the effect that the cross sections for this highway construction job were different from the usual cross sections furnished by the Department in that "they had rock drawn in at 100 foot intervals and most plans did not have the rock drawn in." The contractors did not make an independent subsurface investigation, but testified that they relied upon the Department's bid information because time was prohibitive and they believed it had done a good job due to the existence of the boring log and cross sections.

The Department argues, however, that the contractors were not entitled to rely on the plans, cross sections, boring data, and other bid materials because of certain contractual provisions stating that they were subject to change by the Department, were "for informational purposes only," and that rock found on any location or elevation of the project would not constitute a waiver of any condition of the contract. These contractual provisions, under the present facts, do not determine the issues here, as a matter of law. These provisions do not clearly specify that the contractors may not rely on the cross sections as an accurate estimate of subsurface rock in making their bid and they do not state that the contractors must make their own independent subsurface investigation. When the cross sections are considered with the boring data furnished, they may be properly interpreted to show the location of blasting rock. The cross sections contained no reference to the contractual provisions stating that they were for informational purposes only, which is very significant in view of the time element involved.

In view of the short time lapse between the advertising and receipt of bids for the project, an issue of fact arises as to whether the contractors were justified in relying upon the site conditions as shown on the cross sections and boring

data as an unqualified representation by the Department. The following comments of the trial judge indicate that he considered the time element to be an important factor in determining liability:

The defendant required the plaintiffs to submit their competitive bid for the construction of the project within twenty-one (21) days after the public advertisement for bids was made. For a construction project as extensive, large and complex as this was, this period of time was entirely too short, limiting and restrictive. The testimony disclosed that other state highway departments normally allow contractors more time to make computations in order to submit a bid for a project to construct a highway. The preparation of a sound and accurate bid on a large highway construction job is a complicated, difficult task. More time than twenty-one (21) days should have been allowed to the plaintiffs to prepare their bid.

The foregoing findings by the trial judge are supported by testimony in the record that it would have required five or six months to make an accurate estimate of rock on a job of this size and difficult terrain. If the Department intended that bidders make independent subsurface investigations, it should have given ample time to conduct such investigations. In view of the restricted time allowed and the furnishing of cross sections and boring data showing the location of rock, it is reasonable to conclude that bidders might be expected to use the information furnished, which time would not permit them to otherwise obtain; and where insufficient time is allowed to make a personal study, the State cannot invoke general disclaimer or exculpatory clauses to exonerate itself from liability. *Peter Salvucci & Sons v. State*, 110 N. H. 136, 268 A. (2d) 899, 906.

The opinion of Justice Littlejohn and the argument of the Department focus on certain testimony of Mr. Jordan, one of the officials of the contractors, for the conclusion that they admitted the Department made no representations as to rock

quantities. It is elementary that in determining the probative effect of the testimony of a witness, his testimony must be considered in its entirety. When this is done, it becomes evident that the testimony of this witness is susceptible of the reasonable inference that the claimed admission was not made, as is shown by the following from his testimony on cross-examination:

Q. As a result of Wilbur Smith's study and report to you, . . ., prior to the contract in October 1968, L-J and Eastern knew, did it not, that rock excavation quantities could not be accurately calculated from the plans and things and information furnished you by the Highway Department?

A. L-J and Eastern didn't know that. We had cross sections showing it, plotted cross sections showing where rock was going to be. Had we not had the cross sections, we would not have bid the job.

Q. I am talking about accuracy of figures?

A. Liars figure, but figures don't lie. You had a drawing there, showing you where you was going to hit rock.

The quotation in the opinion of Justice Littlejohn of testimony of the witness Williams also fails to consider all of the testimony of this witness. The statement of this witness that "contracting is somewhat of a gamble" and that if he had found zero yards of hard rock he would not owe the Department anything is totally irrelevant to the present inquiry. The main inquiry in the breach of warranty action is justified reliance on the plans and cross sections in computing the bid. Just prior to making the statement concerning the gamble, the following question and answer appears:

Q. So, you really couldn't have relied on the quarter-to-one slopes to show you where the rock was, because you knew if rock was encountered you were going to have to take it out.

A. We did rely on it. We used the typical and the specific cross sections.

While admittedly other inferences may be drawn, the record clearly gives rise to a reasonable inference that the Department made positive representations as to the subsurface conditions on the project, upon which the contractors were entitled to rely, and did rely to their damage. Such facts support recovery. *Robert E. Lee and Co., Inc. v. Commission of Public Works,* 248 S. C. 84, 149 S. E. (2d) 55.

The applicable principles are summarized from the cases in the annotation in 76 A. L. R. 268, 269, as follows:

. . . Where plans or specifications lead a public contractor reasonably to believe that conditions indicated therein exist, and may be relied upon in making his bid, he will be entitled to compensation for extra work or expense made necessary by conditions being other than as so represented.

The record also sustains the finding of the trial judge that the contractors are entitled to additional compensation for 524,932 cubic yards of rock. The Department argues that there was no competent evidence to support the conclusion that there was an "overrun" in the foregoing amount. The trial judge had before him testimony as to specific quantities of rock in certain areas in excess of the 524,932 overrun figure, and photographs showing rock in areas where none was shown on the plans. The evidence is adequate to support the finding that the contractors are entitled, under a breach of warranty theory, for an additional 524,932 cubic yards of rock in excess of the quantities represented in the Department's bid materials.

The trial judge computed the amount of the judgment by using the base figure of $1.12 per cubic yard as the reasonable cost of excavating solid rock. This was arrived at from testimony that, in arriving at a composite bid price of $.34 for unclassified excavation, the contractors estimated $1.12 per cubic yard for the removal of rock and $.2671 per cubic yard for the removal of common excavation. The figure of $1.12 per cubic yard for removal of rock was found to be reasonable, and the judgment was calculated by figuring the

overrun at $.78 per cubic yard, the latter figure representing the difference between $.34 that the plaintiffs (contractors) were paid and $1.12 that the plaintiffs should have been paid. The record amply sustains these findings.

The trial judge awarded interest before judgment on the award. In this he was in error. It is correctly pointed out that prejudgment interest should not be awarded where the amount due on the claim is incapable of ascertainment by calculation. 25 C. J. S. Damages § 52. This case involved a genuine dispute not only as to liability but as to the amount due. Under these circumstances, it was error to assess interest on the award from a point in time prior to judgment.

Subsequent to the judgment of the lower court, the Department filed a motion for judgment notwithstanding findings of fact and a petition for leave to present additional evidence and a reconsideration of the case. Relief was sought under Section 15-27-130 of the 1976 Code of Laws on the ground that the judgment was entered against the Department through its excusable neglect. The issue raised involved alleged unauthorized changes in the road plans sometime between 1968 and 1973 during the progress of the highway construction.

The trial judge, in effect, held that the grounds presented did not constitute excusable neglect so as to entitle the Department to relief on that ground. It appears that the alleged altered documents were in the hands of the Department from six to eight years prior to the trial, and the Department admitted that it entertained questions during the trial concerning the present issue but did not then raise them. In the exercise of his discretion in the matter, the trial judge properly held that the failure to discover and produce the evidence now in question did not constitute excusable neglect.

The final contention is that recovery is precluded under Article 3, Section 30, of the South Carolina Constitution, which provides:

The General Assembly shall never grant extra compensation, fee or allowance to any public officer, agent, servant or contractor after service rendered, or contract made, nor authorize payment or part payment of any claim under any contract not authorized by law; but appropriations may be made for expenditures in repelling invasion, preventing or suppressing insurrection.

There is no merit in this contention. The lower court correctly ruled that this is a prohibition directed at the General Assembly and does not affect the jurisdiction of the courts to pass on contractual rights between the highway department and public contractors.

There can be no doubt that the contractors grossly underbid the present project and sustained a sizeable loss. The record also shows that, including the award of the lower court, the State would receive full value, and more, in the quantity and quality of the work performed by the contractors in the construction of the highway. We are not, therefore, dealing with a case where it is sought to require the State to pay for something it did not receive, but rather with the issue of whether the contractors are legally entitled to receive, under these facts, payment for the large unanticipated costs incurred in completing construction of the project.

In concluding, it is important to point out again that the question in this case is not whether this Court would have decided the factual issues as the trial judge did, but rather our sole inquiry is to determine whether there is any competent evidence to sustain the conclusions reached by him. It is possible to view the various contractual provisions separately and reach the conclusion that no liability exists. However, when the provisions of the contract are viewed in the light of the surrounding facts and circumstances, it is equally clear that the fact finder could reasonably conclude that the disclaimer provisions should not be allowed to relieve the Department of liability. There is ample evidence to sustain

the judgment under appeal and to hold otherwise, I respectfully submit, is to invade the province of the trier of the facts.

I would affirm the judgment, but exclude the allowance of interest prior to judgment.